UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
12 CIV 1156

CLIFFORD STREIT,

Plaintiff,

Case No.:

- against -

CANDACE BUSHNELL,

Defendant.

RECEIVED FEB 14 2012 U.S.D.C. S.D. N.Y. CASHIERS

**COMPLAINT AND JURY DEMAND**

COMES NOW Plaintiff, Clifford Streit ("**Streit**" or "**Plaintiff**"), by and through his undersigned counsel, The Law Offices of Neal Brickman, P.C., located at 317 Madison Avenue, 21st Floor, New York, New York 10017, and as and for his Complaint against Defendant, Candace Bushnell ("**Bushnell**" or "**Defendant**") states and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for a breach of a written settlement agreement arising out of Defendant's failure to pay to Plaintiff sums undeniably due to him pursuant to that certain Agreement entered into by and between the Plaintiff and Defendant dated October 20, 2006 (the "**Agreement**"). A copy of the Agreement is attached hereto as Exhibit "1" and incorporated herein by reference. The purpose of the Agreement was to settle a civil lawsuit filed by Streit against Bushnell in the United States District of New York, Case No. 05 CV 5155 (VM) and in the Supreme Court of the State of New York, County of New York, Index No. 11678/05 (the "**Actions**").

2. Plaintiff seeks recovery, as compensatory damages, of his share of certain monies paid to Defendant, in which Plaintiff is, or was, entitled to pursuant to the explicit

terms of the Agreement, together with interest and costs, including reasonable attorneys' fees.

## PARTIES

3. Plaintiff Clifford Streit is, and was at all times relevant hereto, a resident of the State of New York and New Jersey, residing at, among other places, 140 Riverside Drive, Apartment 12E, New York, New York 10024.

4. Defendant Candace Bushnell upon information and belief, is and was at all times relevant hereto, a resident of the State of New York residing at 45 East 9th Street, Apartment 98, New York, New York 10003.

## JURISDICTION AND VENUE

5. Jurisdiction is proper because the Parties agreed to the jurisdiction of this Court pursuant to Paragraph 7 of the Agreement, which states *inter alia*, "The parties to the Agreement consent to the jurisdiction of the Court before which the case *Clifford Streit v. Candace Bushnell and Darren Star,* Case no. 05 CV 515 (United States District Court, Southern District of New York), was pending to enforce the terms of the Agreement." (See Exhibit 1, Paragraph 7).

6. Venue is properly laid in this District under 28 U.S.C.A. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

7. On or about September 21, 2006, Plaintiff and Defendant entered into the Agreement in order to resolve disputes between the Parties.

2

8. Pursuant to the Agreement Defendant agreed, *inter alia,* to pay to Plaintiff seven-and-one-half percent (7.5%) of any revenue paid to Defendant by "HBO/Sex and the City" for works attributable to the magazine articles and book, "Sex and the City" owned by Defendant.

9. According to Paragraph 2 of the Agreement, titled "The Settlement," the Parties agreed that "(1) Bushnell shall pay Streit seven-and-one-half percent (7.5%) of any and all consideration paid to Bushnell pursuant to the December 18th Agreement less reasonable attorneys' fees and litigation costs incurred by Bushnell from any litigation brought to obtain such consideration, including any share of net syndication revenue paid to Bushnell from the television series *Sex and the City*, after the time period July 26, 2006 forward, in perpetuity, but shall not include any consideration paid to Bushnell based on the rights reserved to Bushnell under Paragraph 9 (entitled "Reserved Rights") of the December 18th Agreement." (See Exhibit 1, Paragraph 2).

10. The "December 18th Agreement" was a written contract between Defendant and Darren Star, Inc. dated December 18, 1995, which included, but was not limited to, a written amendment between HBO, as assignee of Darren Star, Inc., and Bushnell, as well as a letter agreement, dated December 20, 1996, between Bushnell and Darren Star, Inc.. (The "December 18th Agreement" is attached as Exhibit "A" to the Agreement attached hereto to Exhibit 1).

11. Defendant also agreed to pay to Plaintiff residual payments. Paragraph 2(c) of the Agreement states, "[t]he Residual Payments, if any, shall be due and owing, and paid by Bushnell to Streit[...]. Furthermore, within sixty (60) business days after the end of each calendar quarter, Bushnell shall account to Streit by reporting to Streit's attorneys,

3

at the Law Offices of Neal Brickman, in writing, a full and complete description of any and all monies or other consideration which Bushnell received pursuant to the December 18th Agreement during the immediately preceding quarter, it being expressly understood that no accounting shall be due if no such monies or other consideration is received by Bushnell. The information provided to Streit's attorneys under this paragraph shall be confidential and shall not be disclosed to Streit, or utilized by him for any purpose, except such disclosures as may be reasonably required for Streit to enforce his rights and interests under this Agreement."

12. Defendant has paid to Plaintiff the following amounts pursuant to the Agreement:

- October 1, 2006, twenty five thousand dollars ($25,000.00);

- April 12, 2007, sixteen thousand four hundred seven dollars and twenty five cents ($16,407.25);

- July 15, 2009 one hundred thousand sixty four thousand nineteen dollars and fifty three cents ($164,019.53);

- October 28, 2009, twenty five thousand three hundred and twelve dollars and fifty cents ($25,312.50).

13. Plaintiff has received no further payments from Defendant pursuant to the Agreement.

14. Plaintiff and Defendant were each represented by attorneys of their choice and agreed to be bound by the terms and conditions of the Agreement.

15. Upon information and belief, however, Defendant has breached the Agreement by failing to comply with Paragraphs 2(a) and 2(c).

16. Upon information and belief, Defendant has received "revenue" for some of the movies, television show syndication and derivative works detailed in the Agreement

4

but has failed and refused to pay to Plaintiff that portion or, in fact, any portion, to which Plaintiff is entitled under the terms of the Agreement.

17. Upon information and belief, since October 28, 2009 -- the last time that Defendant paid any monies to Plaintiff -- Defendant has received additional "revenue" monies in connection with the movies, *Sex and the City* and *Sex and the City 2* as well as the television series which continues to be in syndication.

18. Notwithstanding the fact that all six seasons of *Sex and the City,* the television series, have been released internationally on DVD and are available on iTunes, there are also *Sex and the City* and *Sex and the City 2* film soundtracks and DVDs, and the television series continues to be syndicated, Defendant claims, that she has not received **any** additional monies from these works since on or about October 28, 2009.

19. Upon information and belief, Defendant has received commissions and other fees, to which Plaintiff is entitled to a share pursuant to the Agreement for, *inter alia,* the film *Sex and the City* released in United States cinemas on May 30, 2008 based on the HBO television series of the same name and the film's sequel *Sex and the City 2* which opened in United States cinemas on May 27, 2010 and the subsequent home viewer distribution fees and commissions collected by Defendant from these films.

20. The last payment Plaintiff received from Defendant was on or about October 28, 2009. On or about this date, Defendant paid to Plaintiff twenty five thousand three hundred and twelve dollars and fifty cents ($25,312.50) which Defendant claimed represented seven-and-one-half percent (7.5%) of the payment Defendant received for the film *Sex and the City 2*.

5

21. The film *Sex and the City 2[1]*, was released in United States cinemas on May 27, 2010 and was a box office hit, grossing two hundred ninety four million, six hundred eighty- thousand, seven hundred seventy-eight thousand dollars ($294,680,778) at movie box offices -- internationally.[2]

22. Upon information and belief, Defendant has been paid certain additional fees and commissions for *Sex and the City 2*, yet, has failed to pay to Plaintiff the total amount of the monies owed to him from the fees and commissions that Defendant has received for *Sex and the City 2*.

23. Upon information and belief, Defendant has received monies in connection with, *inter alia, Sex and the City 2*, which was released **after** Defendant paid Plaintiff last.

24. On October 26, 2010, *Sex and the City 2,* was released for home view via DVD, Blue-ray and on iTunes and sold, in the United States alone, nine hundred eighty (989,144) units which totaled a gross DVD sales of eighteen million four hundred twenty-two thousand, three hundred and fifty eight dollars ($18,422,358).

25. Upon information and belief, Defendant has been paid certain fees and commissions for *Sex and the City 2*, yet, has failed to pay to Plaintiff any of the monies owed to him from the fees and commissions that Defendant has received for *Sex and the City 2*.

26. Notwithstanding the monumental success of *Sex and the City 2*, both at the movie box office and with home viewership distribution, Defendant has failed to pay

---

[1] On or about 2008 the film *Sex and the City* was released based on the HBO television series of the same name.

[2] Source: *http://www.the-numbers.com/movies/2010/SATC2.php*. Accessed February 13, 2012.

Plaintiff since the October 28, 2009 payment of twenty five thousand three hundred and twelve dollars and fifty cents ($25,312.50).

27. Upon information and belief, Defendant has failed to pay to Plaintiff seven-and-one-half percent (7.5%) of additional monies that she received, since October 28, 2009 on the first movie, and additional syndication fees from the television series, which continues to be shown in re-runs.

28. Defendant has also failed to provide, as she agreed to pursuant to Paragraph 2(c), an accounting to Plaintiff's attorneys, within sixty (60) business days after the end of each calendar quarter, which would be in writing and include a full and complete description of any and all monies or other consideration which Defendant received pursuant to the December 18th Agreement.

## COUNT I
## (Breach of Contract)

29. Plaintiff repeats and realleges Paragraphs "1" through "28" of this Complaint as if each of those paragraphs was set forth fully and at length herein.

30. Plaintiff and Defendants agreed to be bound by the terms and conditions of the Agreement upon execution of the Agreement after each party's attorney negotiated the terms and conditions of that Agreement.

31. Plaintiff has fully performed and complied with the terms and conditions of that Agreement.

32. Defendant has breached the terms and conditions of the Agreement causing Plaintiff damage.

33. Upon information and belief, Defendant has specifically breached Paragraphs 2(a) and 2(c) of the Agreement by failing and refusing to pay to Plaintiff a portion of the

7

"revenue" that she received for the films, *Sex and the City,* and *Sex and the City* 2, include her share of box office sales and home distribution sales, and for the *Sex and the City*, television series, which continues to be in syndication.

34. Pursuant to Paragraph 2(a) of the Agreement, Defendant agreed to pay to Plaintiff seven-and-one-half percent (7.5%) of any and all consideration paid to Defendant pursuant to the December 18th Agreement.

35. Upon information and belief, Defendant has received certain additional monies and consideration pursuant to the December 18th Agreement, since October 28, 2009, but has failed and refused to pay Plaintiff pursuant to Paragraph 2(a) of the Agreement a percentage of those payments.

36. Additionally, pursuant to Paragraph 2(c) of the Agreement, Defendant agreed to pay to Plaintiff the residual payments. Defendant agreed in Paragraph 2(c) that within sixty (60) business days after the end of each calendar quarter, she would provide to Plaintiff's attorneys, "The Law Offices of Neal Brickman, P.C.," an accounting in writing, with a full and complete description of any and all monies or other consideration which Defendant received pursuant to the December 18th Agreement during the immediately preceding quarter.

37. Upon information and belief, Defendant has received additional monies and other consideration pursuant to the December 18th Agreement but has failed to provide in writing (or otherwise) any description of these monies and other consideration that she has received -- as required under the Agreement.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendant for her breach of the Agreement, requiring Defendant to pay to Plaintiff seven-and-one-half

8

percent (7.5%) of all revenue received by Plaintiff since October 28, 2009 in an amount to be determined at trial, but in no event less than, upon information and belief, $150,000.00, together with interest and costs, and any such other relief as this Court deems just and proper.

## JURY DEMAND

WHEREFORE, Plaintiff hereby demands a jury trial of the facts and circumstances alleged herein.

Dated: February 14, 2012
      New York, New York

The Law Offices of Neal Brickman, P.C.
Neal Brickman (NB 0874)
Attorneys for Plaintiff
*Clifford Streit*
317 Madison Avenue - 21st Floor
New York, New York 10017
(212) 986-6840

# EXHIBIT 1

## SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (the "Agreement") entered into by and between CLIFFORD STREIT and CANDACE BUSHNELL.

### RECITALS:

WHEREAS, CLIFFORD STREIT commenced a civil action against CANDACE BUSHNELL in the United States District Court, Southern District of New York, Case No. 05 CV 5155 (VM) and in the Supreme Court of the State of New York, County of New York, Index No. 116787/05 (the "Actions"); and

WHEREAS, CANDACE BUSHNELL denies all the allegations made against her by CLIFFORD STREIT in the Actions; and

WHEREAS, pursuant to the terms and conditions set forth herein which are to be kept confidential, CLIFFORD STREIT and CANDACE BUSHNELL now wish to settle all claims or potential claims between them;

NOW, THEREFORE, in consideration of the mutual, covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties to this Agreement agree as follows:

1.    Definitions

a.    The term "Actions" shall mean the civil action entitled *Clifford Streit v. Candace Bushnell and Darren Star*, pending in the United States District Court, for the Southern District of New York, bearing Case No. 05 CV 5155 (VM) and the civil action entitled *Clifford Streit v. Candace Bushnell and Darren Star*, pending in the Supreme Court of the State of New York, County of New York,

bearing Index No. 116787/05 . Streit represents that he has commenced no other
action against Bushnell.

      b.     The term "Bushnell" shall mean Candace Bushnell and shall
include any and all of her heirs, executors, administrators, agents, attorneys,
representatives and/or assigns.

      c.     The term "December 18th Agreement" shall mean the written
contract between and among Bushnell and Darren Star, Inc., dated December 18,
1995, together with any and all attachments and exhibits thereto, as well as any and all
amendments thereto (including, but not limited to, the written amendment between
HBO, as assignee of Darren Star, Inc., and Bushnell; as well the letter agreement,
dated December 20, 1996, between Bushnell and Darren Star, Inc.), true and correct
copies of which are annexed hereto as "Exhibit A" of this Agreement and made a part
hereof.

      d.     The term "HBO" shall mean "Home Box Office, currently a
Division of Time Warner Entertainment Company, L.P." as well as any and all of its
affiliates, predecessors, successors, parents, subsidiaries, officers, directors,
employees, agents, and/or assigns.

      e.     The term "Initial Payment" shall mean the payment from
Bushnell to Streit described in paragraph 2 a. (1) of this Agreement.

      f.     The term "parties" shall mean Streit and Bushnell, collectively.

      h.     The term "Star" shall mean Darren Star and shall include any
and all of his agents and assigns, including but not limited to any and all business
entities which, in whole or in part, are owned, controlled, or operated, by Darren Star
or through which he has conducted business, such as the entity known as "Darren
Star, Inc." and "Darren Star Productions, Inc."

       i.       The term "Streit" shall mean Clifford Streit and shall include any and all of his heirs, executors, administrators, agents, attorneys, representatives and/or assigns.

      2.     The Settlement

       a.       For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Bushnell and Streit, Bushnell shall cause the following payments to be made to Streit in accordance with the terms set forth herein (1) Bushnell shall pay to Streit the sum of twenty five thousand dollars (US$25,000) and (2) Bushnell shall pay Streit seven-and-one-half percent (7.5%) of any and all consideration paid to Bushnell pursuant to the December 18th Agreement less reasonable attorneys' fees and litigation costs incurred by Bushnell from any litigation brought to obtain such consideration, including any share of net syndication revenue paid to Bushnell from the television series *Sex and the City*, after the time period July 26, 2006 forward, in perpetuity, but shall not include any consideration paid to Bushnell based on the rights reserved to Bushnell under Paragraph 9 (entitled "Reserved Rights") of the December 18th Agreement. No other payments of any kind or nature whatsoever shall be due to Streit.

       b.       The Initial Payment shall be due, owing, and paid to Streit by Bushnell within five business days from the date an executed copy of the Agreement with executed Stipulation of Dismissal and Stipulation of Discontinuance are received from Streit, and shall he delivered to Streit in the manner described in sub-paragraph "d." below. The Stipulation of Dismissal and the Stipulation of Discontinuance shall be held by Bushnell's counsel, Bushell & Valliere LLP, in escrow pending delivery of the $25,000 in full.

c. The Residual Payments, if any, shall be due, owing, and paid by Bushnell to Streit, in the manner described in paragraph "d." below, within twenty (20) business days after such consideration is paid to Bushnell. Furthermore, within sixty (60) business days after the end of each calendar quarter, Bushnell shall account to Streit by reporting to Streit's attorneys, the Law Offices of Neal Brickman, in writing, a full and complete description of any and all monies or other consideration which Bushnell received pursuant to the December 18th Agreement during the immediately preceding quarter, it being expressly understood that no accounting shall be due if no such monies or other consideration is received by Bushnell. The information provided to Streit's attorneys under this paragraph shall be confidential and shall not be disclosed to Streit, or utilized by him for any purpose, except such disclosures as may be reasonably required for Streit to enforce his rights and interests under this Agreement.

d. Any and all payments contemplated under this Agreement shall be made by wire transfer, and/or certified check, to the attorney trust account of the Law Offices of Neal Brickman, 317 Madison Avenue, 21st Floor, New York, New York 10017.

e. Upon receipt of the funds described in sub-paragraph 2 a. (1) above and the execution of this Agreement, Bushnell will cause to be filed with the respective Clerks of the Courts, the Stipulation of Dismissal, with Prejudice and Without Costs, in substantially the same form as is annexed as "Exhibit B" hereto and the Stipulation of Discontinuance, with Prejudice and Without Costs, in substantially the same for as is annexed as "Exhibit C" hereto.

3. General Releases

a. Streit hereby completely and unconditionally releases and

discharges Bushnell, her attorneys, and all persons acting by, through, under or in concert with them or any of them, from all actions, causes of action, suits, debts, dues, sums of money, commissions, compensation for purported personal services rendered, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, counterclaims, and demands whatsoever, in law or in equity whether known or unknown, anticipated or unanticipated, which Streit had, may have, or may hereafter have, or claim arising from any cause whatsoever from the beginning of the world until the date of this Agreement, including, but not limited to, any matters which arise out of, directly or indirectly, or are in any way connected with the Actions, provided that the parties' rights and obligations set forth in this Agreement on a going forward basis only shall be excluded from the scope of this release, and Streit shall retain the right and power to enforce the rights and interest granted to him under this Agreement.

           b.    Bushnell hereby completely and unconditionally release and discharge Streit, his attorneys, and all persons acting by, through, under or in concert with

them, or any of them, from all actions, causes of action, suits, debts, dues, sums of money, commissions, compensation for purported personal services rendered, accounts, reckonings, bonds, bills, specialties, covenants, contracts. controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, counterclaims and demands whatsoever, in law or in equity, whether known or unknown, anticipated. or unanticipated, which Bushnell had, may have, or may hereafter have, or claim arising from any cause whatsoever from the beginning of the world until the date of this Agreement, including, but not limited to, any matters

which arises out of, directly or indirectly, or are in any way connected with the
Actions, provided that the parties' rights and obligations set forth in this Agreement
on a going forward basis only shall be excluded from the scope of this release, and
Bushnell shall retain the right and power to enforce the rights and interest granted to
her under this Agreement.

1)        c.        To the extent applicable, the Parties expressly waive any rights
conferred upon them by Section 1542 of the California Civil Code and expressly
consent that this Agreement and Release shall be given full force and effect
according to all of its terms, including those terms relating to unknown and
unsuspected claims, if any, as well as those terms relating to any other claims.
Section 1542 provides:

2)

3) A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO
EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE
RELEASE, WHICH IF KNOWN BY HIM MUST HAVE
MATERIALLY AFFECTED HIS SETTLEMENT WITH THE
DEBTOR.

4.        Confidentiality

a.        Except as may be required by law, the parties to this Agreement
hereby agree and covenant that they shall forever keep confidential and refrain from
disclosing to anyone or any entity any of the facts and circumstances relating to this
Action, including but not limited to the facts underlying the allegations in the
complaint, amended complaint, answer, and counterclaims, the contents of this
Agreement, any of the terms and conditions thereof, or any of the negotiations leading
thereto, other than to state as follows to any person or entity who inquires: "This
matter has been resolved. I have no further comment."

b.        The parties to this Agreement further agree that, in the event

that any of them are compelled, by judicial process or otherwise, to disclose any of the facts and circumstances relating to this Lawsuit or this Agreement or its contents, such party shall give notice to all other parties to this Agreement following receipt of such process or other notice requiring such disclosure as soon as reasonably practicable, and the other party may apply for a protective order, or other appropriate relief, to keep such information confidential.

      c.     The parties shall never initiate any contact with the media or press under any circumstances regarding this dispute and if ever contacted by the press or media shall not comment to the press or media about the Actions, and/or the settlement of the Actions, except to state as follows: "This matter has been resolved. I have no further comment."

      5.     Representations & Warranties

      a.     Bushnell has not and will not assign, encumber, compromise, and/or release any rights she has under the December 18th Agreement without notifying Streit. Notwithstanding anything contained in the foregoing sentence, Bushnell is under no obligation to enforce any rights she may have under the December 18th Agreement and has sole and complete unfettered discretion as to whether to take any affirmative steps to enforce such rights and owes Streit no duty with regard to same in any respect.

      b.     Streit will not assign is rights under this Agreement without notifying Bushnell and without securing an independent and full written commitment by the assignee to comply with all confidentiality provisions contained in this Agreement.

      c.     Each party hereto represents and warrants to each other party hereto that: (i) he/she has authority to execute this Agreement; (ii) the execution,

delivery and performance of this Agreement does not require the consent or approval

of any other person, partner, entity, governmental body, trust, trustor or other

authority; (iii) this Agreement is a valid, binding and legal obligation of the

undersigned enforceable in accordance with its terms, and does not knowingly

contravene or conflict with any other Agreement, indenture or undertaking to which

any party hereto is a party; and (iv) each party hereto is the sole and lawful owner of

all right, title and interest in and to every claim and other matter which the party

purports to settle or compromise herein.  Each party hereto agrees to indemnify and

forever hold the other harmless from any loss caused by the breaching party's breach

of this Agreement.

6.    Entire Agreement

This Agreement represents the entire agreement between and among

the parties hereto with respect to the parties' mutual obligations and rights set forth

herein.  This Agreement supersedes all prior and contemporaneous oral or written

agreements and discussions between and among the parties.  No provision herein may

be changed, modified, altered, or waived except in writing signed by all parties hereto.

The parties to this Agreement acknowledge that no representation, promise, or

inducement has been made with respect to the subject matter herein, other than as

specifically set forth in this Agreement, and that none of them has entered into this

Agreement in reliance upon any other representation, promise, or inducement with

respect to the subject matter set forth herein.

7.    Jurisdiction

This Agreement shall be construed, performed, and governed under the

laws of the State of New York without regard to principles of choice of law and/or

conflicts of law, as a contract performed within the State of New York. The parties to

the Agreement consent to the jurisdiction of the Court before which the case *Clifford Streit v. Candace Bushnell and Darren Star*, Case no. 05 CV 5155, was pending to enforce the terms of the Agreement.

8. Notice

Any and all notices required by the terms of this Agreement shall be

delivered by facsimile and overnight mail, as follows:

To Streit:

Neal Brickman, Esq.
LAW OFFICES OF NEAL BRICKMAN
317 Madison Avenue
21st Floor
New York, New York 10017
Telephone: (212) 986-6840
Facsimile: (212) 986-7691

To Bushnell:

Victor C. Bushell, Esq.
BUSHELL & VALLIERE LLP
60 East 42nd Street, Suite 2925
New York, New York 10165
Telephone: (212) 949-4700
Facsimile: (212)286-0513

Each party to this Agreement may by written notice to the above, change the

authorized recipient of the notices set forth herein.

9. Counterparts

This Agreement may be executed in counterparts and by facsimile, and

each counterpart shall be and constitute a part of this Agreement, and all counterparts

together shall constitute the original Agreement. However, this Agreement is not

binding until executed by all parties hereto.

10. Recitals, Exhibits, and Schedules Incorporated

The Recitals and Exhibits of this Agreement shall be and hereby are

incorporated into this Agreement and made part hereof.

IN WITNESS WHEREOF, the parties hereto have executed this

Agreement as of the day and year written, below.

_____
CLIFFORD STREIT

Dated: September 21 , 2006


_____
CANDACE BUSHNELL

Dated: September ____ , 2006

# EXHIBIT A

Darren Star, Inc.
c/o Bloom, Hergott, Cook, Diemer & Klein, LLP
150 S. Rodeo Drive, Third Floor
Beverly Hills, CA 90212
Attn: Melanie Cook, Esq.

Dated as of December 18, 1995

Candace Bushnell
International Creative Management
8942 Wilshire Boulevard
Beverly Hills, CA 90211
Attn: Danny Greenberg

Re: "Sex and the City" / Series of Magazine Articles and Unpublished Book

Ladies and Gentlemen:

This will confirm the agreement ("Agreement") between Darren Star, Inc. ("Purchaser"), on the one hand, and Candace Bushnell ("Owner"), on the other hand, with respect to (i) the series of magazine articles entitled "Sex and the City" written by Owner (a complete list of titles is attached hereto as Exhibit "A" and incorporated herein by this reference) and published in *The New·York Observer*, ("Articles"), and (ii) the presently unpublished book presently entitled "Sex and the City' written by Owner based upon the Articles ("Book") (which, together with all now existing and hereafter created titles, themes, ideas, stories, contents, dialogue, characters, artwork, visual images, issues, adaptations and other versions thereof, is hereinafter collectively sometimes called the "Property"). The term "Picture" as used herein shall mean the first production produced by Purchaser based on the Property, whether intended for initial television or theatrical release or otherwise.

A.    **Conditions Precedent.** Purchaser's obligations hereunder shall be contingent upon the occurrence of all of the following events: (a) Full execution of this Agreement; and (b) Purchaser's approval of the chain of title to the Property.

1.    **Option.**

(a)    In consideration of the sum of Twenty-Five Thousand Dollars ($25,000) ("Initial Option Payment"), payable upon execution hereof, and other good and valuable consideration, Owner hereby grants to Purchaser the sole, exclusive and irrevocable right and option ("Option") to purchase all right, title and interest, except for those rights reserved to Owner pursuant to paragraph 8 hereof, in all languages, throughout the universe in perpetuity in and to the Property. The Option shall be exercisable at any time commencing on the date hereof and continuing through and including the date which is twelve (12) months thereafter ("Initial Option Period"). The Initial Option Payment shall apply against the Purchase Price pursuant to paragraph 2(a) below.

(b)     The period within which the Option may be exercised may be extended for an additional period of six (6) months upon written notice and payment to Owner of an additional sum of Ten Thousand Dollars ($10,000) ("First Extension Payment") on or before the expiration of the Initial Option Period ("First Extension Period"). The First Extension Payment, if any, shall not apply against the Purchase Price pursuant to paragraph 2(a) below.

(c)     The period within which the Option may be exercised may be further extended for an additional period of six (6) months upon written notice and payment to Owner of an additional sum of Fifteen Thousand Dollars ($15,000) ("Second Extension Payment") on or before the expiration of the First Extension Period ("Second Extension Period"). The Second Extension Payment, if any, shall not apply against the Purchase Price pursuant to paragraph 2(a) below.

The Initial Option Period, the First Extension Period and the Second Extension Period are sometimes referred to herein together as the "Option Period."

(d)     During any and all periods during which the Option is exercisable, Purchaser shall have the right to engage in pre-production and production activities with respect to a theatrical motion picture or other production intended to be based on the Property, including, without limitation, the preparation and/or submission of treatments, screenplays or other writings based upon the Property and the negotiation and consummation of agreements relating to the rights in the Property which may be acquired by Purchaser hereunder.

(e)     The Option Period shall be extended concurrently for any period during which a third party makes a claim involving the Property until such claim is resolved so that the rights to be granted hereunder can be acquired free and clear of any claims, demands, liens or encumbrances of any kind whatsoever. If litigation has not commenced within twelve (12) months, Purchaser may, in addition to any additional rights and remedies Purchaser may have at law or in equity, (i) rescind this Agreement by written notice to Owner and, thereupon, Owner shall repay to Purchaser all monies paid hereunder, or (ii) Purchaser may exercise the Option and withhold from any monies payable to Owner hereunder such amount as Purchaser may deem necessary to cover Owner's potential liability (including, without limitation, costs, expenses and attorneys' fees) on account of such claim. The Option Period shall also be extended concurrently for the duration of any event of force majeure (including, without limitation, any riot, war, act of God, strike or labor controversy) affecting the motion picture or television industries or the development and/or production of the Property. No suspension for an event of force majeure shall exceed a period of six (6) months from the date of such suspension.

(f)     The Option shall be deemed exercised upon written notice (accompanied by payment of the Purchase Price, as defined below) given to Owner during the Option Period, but in no event later than the commencement of principal photography of the Picture.

2.     Consideration. As full and complete consideration for all of the rights herein granted and assigned and to be granted and assigned by Owner to Purchaser upon the exercise, if any, of the Option, and for Owner's representations, warranties and agreements hereunder, Purchaser agrees to pay, and Owner agrees to accept, compensation as follows:

(a)    Purchase Price: The purchase price for the Property shall be One Hundred Thousand Dollars ($100,000) ("Purchase Price"). The Purchase Price shall be payable anytime on or before the expiration of the Option Period and shall be reduced by the Initial Option Payment.

(b)    Net Profits: If the Picture is produced pursuant to the rights granted hereunder, then Owner shall be entitled to receive an amount equal to five percent (5%) of one hundred percent (100%) of the "net profits", if any, derived from the exploitation of the Picture. For purposes hereof, "net profits" shall be computed, defined, accounted for and paid as net profits are computed, defined, accounted for and paid pursuant to the provisions of the standard "net profits" definition of the production, financing and/or distribution entity with whom Purchaser enters into an agreement (the "P/F/D Agreement") with respect to the Picture. In the event that Purchaser does not enter into a P/F/D Agreement, Owner's share of "net profits" shall be computed, defined and paid in accordance with Purchaser's standard definition of net profits; provided that Owner's definition of "net profits" shall be no less favorable than Purchaser's definition of "net profits". In addition, the definition for "net profits" shall include any recoveries obtained by Purchaser pursuant to paragraph 7 below, less all costs and fees incurred in connection with such recovery. Owner acknowledges that Owner's share of net profits, if any, provided hereunder shall not be a lien upon or claim against any of the rights granted herein, the Picture or any other exploitation of the rights granted herein.

3.    Production Bonus: If the Picture is produced by Purchaser, Owner shall be entitled to receive one of the following applicable bonuses (in addition to the Purchase Price) within ten (10) days following the commencement of principal photography of the Picture.

(a)    Television Motion Picture/Mini-Series: If the Picture is produced as a television motion picture or a mini-series (collectively, "Television Motion Picture), Owner shall be entitled to receive a production bonus of Fifty Thousand Dollars ($50,000) for each hour in excess of two (2) hours, pro-rated for half-hours. If any Television Motion Picture is released theatrically (excluding screenings or special or limited showings), Owner shall be entitled to the following: (i) If such exhibition occurs in the United States prior to its initial television exhibition, an amount equal to one hundred percent (100%) of the compensation paid to Owner pursuant to this paragraph 3(a); (ii) If such exhibition occurs in the United States after its initial television exhibition, an amount equal to fifty percent (50%) of the compensation paid to Owner pursuant to this paragraph 3(a); (iii) If such exhibition occurs outside the United States at any time, an amount equal to fifty percent (50%) of the compensation paid to Owner pursuant to this paragraph 3(a); and (iv) In no event shall the aggregate total of payments payable pursuant to this paragraph 3(c)exceed one hundred percent (100%) of the compensation paid to Owner pursuant to first sentence of this paragraph 3(a).

(b)    Theatrical Motion Picture: If the Picture is produced as a theatrical motion picture ("Theatrical Motion Picture"), Owner shall be entitled to receive the following:

(i)    If the final overall approved budget of the Picture on the first day of principal photography thereof (exclusive of overhead, contingency, bond fee, deferments, interest and financing costs) ("Budget") is less than Forty Million Dollars ($40,000,000), a bonus of Two Hundred Thousand Dollars ($200,000); or

(ii)    If the Budget is Forty Million Dollars ($40,000,000) or more, a bonus of Three Hundred Thousand Dollars ($300,000).

4.     **Production Services.** If Purchaser produces the Picture, Owner shall be engaged to render non-exclusive services as a co-producer in connection with the Picture. The terms of such services shall be as follows:

(a)     Television Motion Picture: If Purchaser produces a Television Motion Picture, Owner shall be entitled to receive a flat fee of Thirty Five Thousand Dollars ($35,000) for such services, payable in equal weekly installments over the scheduled period of principal photography of the Picture. In addition, subject network approval, Owner shall be entitled to receive credit as a "Co-Producer" in the main titles thereof, on a separate card.

(b)     Theatrical Motion Picture: If Purchaser produces a Theatrical Motion Picture, Owner shall be entitled to receive a flat fee of Seventy Five Thousand Dollars ($75,000) for such services, payable in equal weekly installments over the scheduled period of principal photography of the Picture. In addition, Owner shall be entitled to receive credit (i) as a "Co-Producer" in the main titles thereof, on a separate card, and (ii) in paid ads issued by Purchaser or under Purchaser's direct control (subject to customary exclusions).

(c)     Television Series: If Purchaser produces a one-half hour or one hour pilot for a television series ("Pilot"), Owner shall be entitled to receive a flat fee of Seven Thousand Five Hundred Dollars ($7,500) for such services on the Pilot. If Purchaser produces a television series based upon the Pilot or a Television Motion Picture ("Series"), Owner shall be entitled to receive an episodic fee of Two Thousand Five Hundred Dollars ($2,500) per new Series episode for the life of the Series. In addition, subject to network approval, Owner shall be entitled to receive credit as "Co-Producer" on the Pilot, in the main titles thereof, on a separate card.

(d)     Except as expressly provided herein, all matters regarding credit, including but not limited to placement, size of type, prominence, etc., shall be determined by Purchaser and the third party financier of the Picture in its sole and absolute discretion. Any casual or inadvertent failure of Purchaser, or any failure by a third party, to comply with the provisions of this paragraph shall not be deemed to be a breach of this Agreement.

5.     **Sequels, Remakes, Television Programs.** If Purchaser produces and releases the Picture based on the Property, the following shall apply:

(a)     Sequel: In the event a "sequel" is produced by Purchaser (as the term "sequel" is commonly understood in the entertainment industry), then Owner shall be entitled to receive sums as follows: (i) an amount equal to fifty percent (50%) of the Purchase Price, (ii) an amount equal to fifty percent (50%) of the applicable bonus paid to Owner pursuant to paragraph 3 above, (iii) an amount equal to one hundred percent (100%) of the applicable co-producer fee paid to Owner pursuant to paragraph 4 above, and (iv) an amount equal to 2 1/2% of 100% of the "net profits" for such Sequel.

(b)     Remake: In the event a "remake" is produced by Purchaser (as the term "remake" is commonly understood in the entertainment industry), then Owner shall be entitled to receive sums as follows: (i) an amount equal to thirty-three and one third percent (33 1/3%) of the Purchase Price, (ii) an amount equal to thirty-three and one third percent (33 1/3%) of the applicable

38335_5.DOC                                  - 4 -

litigation, whether threatened or pending; (vi) Owner has and will hereafter perform all of Owner's obligations, if any, in connection with the Property; (vii) Owner has the full right, power and authority to make and perform this Agreement and to grant the rights transferred hereunder; and (viii)·the Property has not previously been exploited as a theatrical or nontheatrical motion picture or television production, play or otherwise in story or dramatic form, and no rights have been or will be granted to any third party to do so.

(b)     Owner agrees that Owner will not at any time hereafter issue or cause to be issued any publicity (other than incidental publicity relating primarily to Owner, which publicity shall in no event be derogatory to Purchaser or to the Picture) regarding this Agreement or the Picture without Purchaser's written consent, nor will Owner execute any other agreement in conflict herewith or in any way attempt to sell, dispose of, encumber or hypothecate any of the rights herein granted to Purchaser with respect to the Property or do or knowingly permit to be done any act or things by which said rights may be impaired; and Owner agrees that Owner will not use or permit the use of any of the rights in the Property not granted to Purchaser in any manner or for any purpose which would unfairly compete with the full and unrestricted use of the rights herein granted to Purchaser.

(c)     In the event of any breach by Owner of the representations, warranties, agreements and authorizations contained herein, or a claim alleging facts which if true would constitute such a breach, if and to the extent such claim is of a type not ordinarily covered by a so-called errors and omissions or Purchaser's general liability insurance policy, Owner agrees to indemnify and hold harmless Purchaser, and its successors, licensees and assigns, against any claim, loss, damage, cost and expense (including attorneys' fees, whether or not litigation is commenced) suffered thereby. Purchaser agrees to indemnify and hold harmless Owner against any claim, loss, damage, cost and expense (including attorneys' fees) suffered by Owner in connection with (i) material added to the Property or altered by Purchaser; (ii) a breach of Purchaser's representations and warranties hereunder; and (iii) the development, production and exploitation of the Picture, except to the extent Owner is required to indemnify Purchaser hereunder.

(d)     To the extent any material contained in the Property is based in whole or in part on any actual individual, whether living or dead, or involved in a "real life" incident, Owner shall annotate the material contained in the Property in accordance with the guidelines provided in the Annotation Guide attached hereto and incorporated herein by reference. In connection therewith, Owner shall provide a full annotation identifying the source of all factual material contained in the Property which concerns any actual individual, whether living or dead, or involved in a "real life" incident. Owner shall also accurately provide such other information as may be reasonably required by Purchaser for the purpose of permitting Purchaser to evaluate the risks involved in the utilization of the Property supplied by Owner. If Owner abides by the provisions of this subparagraph 6(d) in all material respects, then, notwithstanding anything else contained herein, Owner shall not be responsible for any claims arising from third parties alleging that the Property and/or the Picture is defamatory or otherwise infringes upon such claimants rights of publicity, privacy or any other personal right.

7.     **Infringements of Rights.** Owner hereby grants to Purchaser the free and unrestricted right, but at Purchaser's own cost and expense, to institute in Owner's name and on Owner's behalf, or on behalf of Purchaser and Owner jointly, any and all suits and proceedings at law or in equity, to enjoin and restrain any infringements of, and to otherwise preserve and protect, the rights herein granted, and Owner hereby assigns and sets over to Purchaser any and all recoveries obtained in any such action. Owner will not compromise, settle or in any manner interfere with such litigation if brought, unless Purchaser so requests of Owner in writing.

8.     **Grant of Rights.** Upon exercise, if any, of the Option, Purchaser shall solely and exclusively acquire all right, title and interest of any kind or nature whatsoever, whether now or hereafter existing, in all languages, throughout the universe, in perpetuity, except for the rights reserved by Owner pursuant to paragraph 9 below, in and to the Property and in and to the copyright thereof and all renewals and extensions of copyright. The foregoing rights include, without limitation, all motion picture and television rights (including, without limitation, all silent, sound, dialogue, musical, live action and animated motion picture and television rights and all remake and sequel rights thereto), digital television, video and computer games, videocassette and video or laser disc, any computer assisted media (including, but not limited to, CD-ROM, CD-I and similar disc systems), interactive media and multi-media and any other devices or methods now known or hereafter devised, limited radio broadcasting rights and publication rights not exceeding 7,500 words or 10% of the text, whichever is lesser, and, without limiting any of the foregoing rights, the following sole and exclusive rights throughout the universe:

(a)     The right to make, produce, adapt, exploit and copyright the Picture and one or more additional motion picture adaptations or versions based in whole or in part on the Property including, but not limited to, remakes of and sequels to any motion picture produced hereunder and motion pictures in series or serial form whether for broadcast on television or otherwise, and for such purposes to record, reproduce and license others to record and reproduce in synchronization with such motion pictures, spoken words taken from or based upon the text or theme of the Property and any and all kinds of music, musical accompaniments and/or lyrics to be performed or sung by the performers in any such motion picture and any and all other kinds of sound and sound effects. Such motion picture adaptations or versions may be fixed on film, tape, disc, wire, audiovisual cartridge, cassette or by any other technical process now known or hereafter devised in any and all sizes, gauges, colors and types.

(b)     The right to exhibit, broadcast, transmit, perform, rent, lease and exploit in any manner any motion picture or other production produced hereunder by any and all means and technical processes now known or hereafter devised including, without limitation, film, tape, disc, wire audiovisual cartridge, cassette and all forms of television (including commercially sponsored, sustaining, subscription and pay television) in any place whatsoever, including homes, theaters and elsewhere, whether or not a fee is charged directly or indirectly for viewing any such motion picture.

(c)     Without limitation of any of the other rights to be granted to Purchaser hereunder, the right to broadcast and/or transmit by means of television, radio or any process analogous thereto now known or hereafter devised, all or any part of the Property or any adaptation or version thereof, and announcements of or concerning said motion picture or other version(s) for the purpose of advertising, publicizing or exploiting such motion picture or other version(s), which

38335_5.DOC                                    - 7 -

broadcasts or transmissions may be accomplished through any method or means (other than through the use of living actors performing simultaneously with such broadcast or transmission) including the use of motion pictures (including trailers) and sound recordings reproduced on film, tape, wire, disc, audiovisual cartridge or otherwise.

(d)     The right to publish and copyright or cause to be published and copyrighted in the name of Purchaser or its nominee in any and all languages throughout the universe, in any form or medium, synopses, scenarios, abridged and/or revised versions of, or excerpts from, the Property (collectively, "Excerpts") not exceeding 7,500 words or 10% of the text each, whichever is lesser, adapted from the Property or from any motion picture or other version of the Property produced hereunder solely for the purpose of advertising, publicizing and/or exploiting any such motion picture or other version. Purchaser shall not have the right to sell such Excerpts to the general public.

(e)     The right to publish and exploit screenplays, so-called "photonovels" consisting of still photographs from any motion picture produced hereunder with captions or other written material, and "making of" books and similar books related to the production of any motion picture produced hereunder.

(f)     The right to use all or any part of the Property and any of the characters, dialogue, plots, themes, stories or ideas therein contained, and the title of the Property and title or subtitle of any component of the Property, as the title of any motion picture or other version of the Property and/or as the title of any musical composition contained in any such motion picture or other version of the Property.

(g)     The right to manufacture, sell, furnish, supply and distribute products, by-products, services, facilities, merchandise, commodities of every nature and description, including, but not limited to, still photography, drawings, posters, artwork, toys, games, items of wearing apparel, foods, beverages, read-along books (e.g. books packaged with a related sound recording) storyteller records, computer software, tapes, coloring books, comic books, phonograph records, soundtrack recordings, sheet music and similar items which make reference to or are based upon or adapted from any motion picture based upon the Property and produced hereunder and the right to make trade deals and commercial tie-ups of all kinds involving or based on any motion picture project or other production produced hereunder, or any part thereof arising out of or connected with the Property, motion picture or other versions thereof, the title or titles thereof, the characters thereof and/or their names or characteristics.

(h)     The right to use Owner's name in and in connection with any motion picture or other production produced hereunder, and the advertising, publicizing and exploitation thereof, and any other use or exploitation of any of the rights to be granted to Purchaser hereunder (provided that Owner's name shall not be used in a manner so as to endorse any product).

(i)     In connection with the exercise of the rights granted herein, the unrestricted right to edit, amend, add to, subtract from, use, not use, alter, fictionalize or otherwise modify, and combine with any other material, the whole or any part of the Property, and Owner hereby waives in all jurisdictions the so-called "droit moral" of authors with respect thereto.

(j)     The right, in the name of Purchaser or its designee, to register, renew and extend copyrights, trademarks, patents and otherwise protect the rights granted herein and any or all tangible or intangible material of any kind or nature whatsoever created based upon the rights granted herein.

(k)     The right to use characters from the Property in theme parks and other attractions.

(l)     All rights, licenses, privileges and property to be granted to Purchaser hereunder shall be cumulative and Purchaser may exercise or use or not use any or all of said rights, licenses, privileges and properties together or separately. If Owner hereafter makes, publishes or permits to be made or published any revision, remake, adaptation, translation, dramatization, new issues or other versions of the Property, Purchaser shall have and Owner hereby grants to Purchaser without payment therefor (except as specifically provided for herein) all of the same rights therein as are herein granted Purchaser with respect to the Property.

9.     Reserved Rights. Owner hereby reserves for Owner's exclusive use and disposition, subject, however, to the provisions of this Agreement, the publication rights in and to the Property. The publication rights include (i) the right to publish print editions of the Property, and excerpts from and adaptations of the Property, owned or controlled by Owner, in book form, whether hardcover or softcover and in magazines or other periodicals, whether in installments or otherwise, it being acknowledged that unless the Property has heretofore been published in comic book or comic strip form, the right to publish comic books and/or comic strips shall be deemed included within merchandising rights granted to Purchaser hereunder; (ii) the right to publish non-dramatic recorded readings by a single narrator of the text of published print editions of the Property in the form of audiocassettes, audiodisks or similar audio-only devices individually purchased by the end-user; and (iii) the right to publish the text of the published print editions of the Property in the form of CD-ROM, videocassette tape or similar electronically-read devices individually purchased by the end-user. Such electronically-read editions may contain non-moving visual illustrations which are reproductions of the illustrations contained in the applicable print edition of the Property, but may not contain moving visual illustrations and/or audio tracks of any kind. In addition, Owner shall have the right to exercise publication rights described below in any Author-Written Sequel at any time; provided that Owner may not use new characters or new characterizations or attributes of existing characters, which Purchaser controls or has created for the Picture and which were not contained in the Property. Purchaser shall own any and all other rights in any Author-Written Sequel. For the purposes hereof, an "Author-Written Sequel" shall be deemed to be a literary property (story, novel, drama or otherwise), whether written before or after the Property and whether written by Owner or by a successor-in-interest of Owner, using one or more of the characters appearing the Property, participating in different events from those found in the Property, and whose plot is substantially different from the Property.

10.     Copyright. In the event that under any current or future copyright law of any jurisdiction, any of the rights in or to the Property acquired by Purchaser hereunder are subject to a right of reversion or termination (hereinafter the "Reverted Rights"), to the extent and as soon as legally permissible, Owner agrees to accord Purchaser a right of first negotiation and last refusal in

connection therewith which shall operate as follows: At such time as such Reverted Rights are subject to reversion, Owner shall negotiate with Purchaser in good faith with respect to Purchaser's acquisition of such rights. If, following a period of thirty (30) consecutive days Owner and Purchaser are unable to enter into an agreement with respect to Purchaser's acquisition of such Reverted Rights, Owner may thereafter dispose of such Reverted Rights to any other person, subject to the following conditions: Owner shall not, at any time, have the right to dispose of such Reverted Rights at a price or upon terms or conditions less favorable to Owner than those embodied in the last written proposal made by Owner to Purchaser during the aforesaid period of negotiation unless Owner first accorded to Purchaser the right to acquire the Reverted Rights from Owner by notifying Purchaser in writing of any bona fide offer which Owner has received and proposes to accept (hereinafter called the "Offer"), specifying in such notice all of the terms and conditions of said Offer, including the person or entities making the Offer. Purchaser shall have the right to acquire such Reverted Rights upon the same terms and conditions as set forth in the Offer, except that terms and conditions which Purchaser shall be obligated to accept in order to exercise such right of first refusal shall not include those terms and conditions specified in the Offer which cannot be met as easily by one person as by another, such as required employment or use of a certain writer, star, or director. If Purchaser shall elect not to acquire such Reverted Rights, then Owner may dispose thereof, but only to the person and at the price and upon the terms and conditions specified in the Offer, it being understood and agreed that Owner may not dispose of such Reverted Rights to any other party or at a price or upon terms and conditions more favorable to such purchaser or assignee than those offered to Purchaser hereunder without again offering the same to Purchaser as provided herein.

11. Additional Documents. Owner agrees to execute at Purchaser's request any and all additional documents or instruments, including the short form option agreement attached hereto as Exhibit "B" and the short form assignment attached hereto as Exhibit "C", and to do any and all things necessary or desirable to effectuate the purposes of this Agreement. In connection therewith, Owner agrees to execute Exhibits "B" and "C" simultaneously with Owner's execution of this Agreement. If such short-form assignment is undated, Purchaser is hereby authorized to date such short-form assignment and to file same in the United States Copyright office immediately upon exercise of the Option. If Owner fails to do anything necessary or desirable to effectuate the purposes of this Agreement, including but not limited to renewing copyrights and instituting and maintaining actions for infringements of any rights herein granted Purchaser under copyright or otherwise, Owner hereby irrevocably appoints Purchaser as Owner's attorney-in-fact with the right but not the obligation to do any such things, to execute such documents or instruments, and to renew copyrights and institute and maintain actions in Owner's name and on Owner's behalf but for Purchaser's benefit, which appointment shall be coupled with an interest and shall be irrevocable. As a condition precedent to Purchaser's obligations hereunder, Owner agrees to obtain an executed Publisher's Release as attached hereto as Exhibit "D".

12. Credit. Subject to provisions of applicable collective bargaining agreements, if any, and network approval for a Television Motion Picture, Pilot or Series, Purchaser agrees to accord credit on all positive prints of the Picture in the main titles thereof (if the screenwriter's credit appears in the main titles, otherwise said credit shall appear in the end titles of the Picture), in a size of type equal to the size of type accorded the screenwriter of the Picture to read substantially as follows:

38335_5.DOC          - 10 -

(a)    If the Picture has the same title as the Property, "Based upon the series of articles by Candace Bushnell; or

(b)    If the Picture has a title different than the title of the Property, "Based upon the series of articles "Sex and the City" by Candace Bushnell.

In addition, with respect to a Theatrical Motion Picture, Owner shall be accorded the foregoing credit in paid ads and excluded ads, except award, nomination and contratulatory ads naming only the person honored, issued by Purchaser (or its assignee or designee) whenever the screenwriter is accorded credit.

Except as expressly provided herein, all matters regarding credit, including but not limited to placement, size of type, prominence, etc., shall be determined by Purchaser in its sole and absolute discretion. Any casual or inadvertent failure of Purchaser, or any failure by a third party, to comply with the provisions of this paragraph shall not be deemed to be a breach of this Agreement.

13.    No Obligation to Use. Purchaser is not obligated to produce, distribute or exploit the Picture, or if commenced, to continue the production, distribution, or exploitation of the Picture in any territory. Regardless of whether or not Purchaser elects to produce, distribute and/or exploit the Picture, Purchaser is not obligated to use in whole or in part the Property acquired by Purchaser hereunder.

14.    Remedies. With respect to any payment to be made to Owner hereunder, Owner agrees that should for any reason Purchaser fail to make such payment as herein provided, Purchaser shall not be deemed in default hereof unless and until, following such failure, Owner shall give Purchaser written notice demanding such payment and Purchaser shall have failed to make such payment within ten (10) business days after Purchaser's receipt of said notice. In any event, in the event of any breach or alleged breach of Purchaser's obligations under this Agreement, it is expressly agreed that Owner's sole remedy shall be to seek money damages, not exceeding the amount of payment due hereunder, in a court of competent jurisdiction and that in no event shall Owner be entitled to obtain any injunctive or other equitable relief (including, without limitation, rescission) or undertake any legal efforts to restrict the Purchaser's right to exploit the Property and in no event shall Owner have or be deemed to have a lien, charge or other encumbrance upon the rights granted herein or any exploitation thereof.

15.    Payments, Notices and Accountings. All payments, notices, accountings and other data (collectively, the "Notices") from Purchaser to Owner shall be sent to Owner at the following address or at such other address as Owner may from time to time designate in writing:

> International Creative Management
> 8942 Wilshire Boulevard
> Beverly Hills, CA 90211
> Attn: Danny Greenberg

All Notices from Owner to Purchaser shall be sent to Purchaser at the following address or at such other address as Purchaser may from time to time designate in writing:

c/o Bloom, Hergott, Cook, Diemer and Klein, LLP
150 S. Rodeo Drive, Third Floor
Beverly Hills, CA 90212
Attn: Melanie Cook, Esq.

All Notices required or desired to be sent, delivered or served hereunder shall be delivered in person to the addressee or deposited in the mails of the United States, postage prepaid, or telexed or deposited in a telegraph office with all charges prepaid or provided for or telecopied. If any of the Notices are sent by mail of the United States, the Notices shall be deemed served or made or delivered on the date of deposit in the mail of the United States or the date of such telex or deposit in a telegraph office or telecopied, as applicable.

16. Assignment. Purchaser may assign and transfer this Agreement or all or any part of its rights hereunder to any person, firm or corporation, without limitation and Purchaser shall be relieved of its obligations hereunder, provided that unless such assignment is to a "major" or "mini-major" motion picture studio, television network or broadcaster or other similarly financially responsible third party which assumes all obligations in writing, Purchaser shall remain secondarily liable. Owner may not assign this Agreement or any of its rights hereunder.

17. Collective Bargaining Agreement. It is understood that this Agreement and Purchaser's obligations hereunder shall not be subject to or rendered in accordance with the provisions of any collective bargaining agreement currently in effect. In the event that, for any reason, this Agreement shall become subject to any collective bargaining agreement, then to the extent permitted pursuant to such collective bargaining agreement, all payments to Owner hereunder shall be deemed to be in lieu of and credited against any minimum compensation to which Owner is entitled pursuant to said collective bargaining agreement.

18. Miscellaneous. This Agreement supersedes and replaces all agreements (oral or written) between Owner and Purchaser relating to the Property. Until a more formal agreement is executed incorporating all of the foregoing and additional detailed representations, warranties and other provisions customarily included in such formal literary purchase agreements, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors, representatives, assigns and licensees and may not be modified or amended except by a writing signed by both parties. Paragraph headings in this Agreement are for convenience only and shall not be used in the interpretation or construction of this Agreement. Purchaser shall be entitled to withhold from any sums due hereunder amounts required to be withheld by any national, state or local government. Neither Purchaser's entering into this Agreement, nor anything herein contained, nor submissions of the Property to Purchaser, shall be construed to be prejudicial to, or operate in derogation of, any rights, licenses, privileges or property which Purchaser may enjoy or be entitled to with respect to the Property and the rights therein as a member of the general public, as though this Agreement were

not in existence. It is expressly agreed that Purchaser shall not be hereby assuming any of Owner's liabilities or obligations of any kind or nature whatsoever to third parties in connection with the Property. This Agreement shall be interpreted, construed and governed in all respects under the laws of the State of California applicable to agreements executed and intended to be wholly performed within said State and the parties hereby consent to the jurisdiction of the courts of the State of California.

Very truly yours,

Darren Star, Inc.

By:

Its:

ACCEPTED AND AGREED:

Candace Bushnell

## ANNOTATION GUIDE

Annotated material should contain for each element, whether an event, setting or section of dialogue with in a scene, notes in the margin which provide the following information:

1.  Whether the element presents or portrays:

    (a)  Fact, in which case the note should indicate whether the person's name is real, whether (s)he is alive and whether (s)he has signed a release.

    (b)  Fiction, but a product or inference from fact; or

    (c)  Fiction, not based on fact.

2.  Source material for the element:

    (a)  Book;

    (b)  Newspaper or magazine article;

    (c)  Recorded interview;

    (d)  Trial or deposition transcript;

    (e)  Any other source.

NOTE:    Source material identification should give the name of the source (i.e., New York Times article), page reference (if any) and date. To the extent possible, identify multiple sources for each element. Retain copies of all materials, preferably cross-indexed by reference to script page and scene numbers. Coding may be useful to avoid repeated, lengthy references.

Descriptive annotation notes are helpful (e.g., the setting is a hotel suite because John/Jane Doe usually had business meetings in his hotel suite when visiting Los Angeles - New York Times; April 1, 1981, p.8).

EXHIBIT "A"

As of _____, 1996, the following sets forth all articles which are included in the Property:

EXHIBIT "B"

OPTION AGREEMENT

KNOW ALL PERSONS BY THESE PRESENTS: that for good and valuable consideration, receipt of which is hereby acknowledged, the undersigned,. Candace Bushnell ("Owner"), hereby grants to Darren Star, Inc. ("Purchaser"), and Purchaser's representatives, successors, licensees and assigns, the sole, exclusive and irrevocable right and option to purchase and acquire from Owner the sole and exclusive right, title and interest, including, without limitation, all motion picture, television, and customary allied and incidental rights (to include, without limitation, merchandising, advertising, publicity, music publishing, soundtrack, videocassette rights and limited publication rights) (collectively, "Rights") for production, advertising and exploitation purposes, but subject to certain rights which are expressly reserved by Owner, in all languages, throughout the universe in perpetuity, in and to (i) the below-referenced series of magazine articles ("Articles"), and (ii) the unpublished book presently entitled "Sex and the City" written by Owner based upon the Articles, and any other literary material including, without limitation, all now existing and hereafter created titles, themes, ideas, stories, contents, dialogue, characters, artwork, visual images, issues, adaptations, and other versions thereof, and in and to the copyright thereof and all renewals and extensions of such copyright:

Title:        "Sex in the City" (see exhibit "A" attached for complete list)
Written by:   Candace Bushnell

Owner represents and warrants that Owner is the owner of the Rights, and that Owner has not heretofore sold, assigned, transferred, mortgaged, pledged or hypothecated any of the Rights.

The Option herein granted may be exercised by Purchaser, or its heirs, representatives, successors, licensees or assigns as provided in that certain option/purchase agreement dated as of December 18, 1995 ("Agreement") between Purchaser and Owner, and this Agreement is subject to all of the terms and conditions of the said Agreement, all of which are incorporated herein by reference.

IN WITNESS WHEREOF, the undersigned has executed this instrument this _1_ day of _MAY_ , 19⁹₆

Candace Bushnell

STATE OF _New York_ )
                     ) SS.
COUNTY OF _New York_ )

On _May 15, 1996_ before me, _Bridgette V. Blyden_ personally appeared Candace Bushnell, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.        (SEAL)

Notary's Signature

BRIDGETTE V. BLYDEN
Notary Public, State of New York
No. 31-4957599
Qualified in New York County
Commission Expires June 5, 19⁹₆

38335_5.DOC                    - 16 -

EXHIBIT "C"

ASSIGNMENT

KNOW ALL PERSONS BY THESE PRESENTS: that for good and valuable consideration, receipt of which is hereby acknowledged, the undersigned, Candace Bushnell ("Owner"), hereby grants, sells, assigns and sets over to Darren Star, Inc. ("Purchaser"), and Purchaser's representatives, successors, and assigns, as of _____ the sole and exclusive right, title and interest, including, without limitation, all motion picture, television and certain allied and incidental rights (to include, without limitation, merchandising, advertising, publicity, music publishing, soundtrack, videocassette rights and limited publication rights) (collectively, "Rights") for production, advertising and exploitation purposes, but subject to certain rights which are expressly reserved by Owner, in all languages throughout the universe, in perpetuity, in and to (i) the below-referenced series of magazine articles ("Articles"), and (ii) the unpublished book presently entitled "Sex and the City" written by Owner based upon the Articles, and any other literary material, including, without limitation, all now existing and hereafter created titles, themes, ideas, stories, contents, dialogue, characters, artwork, visual images, issues, adaptations, and other versions thereof, and in and to the copyright thereof and of any productions produced by Purchaser which are based thereon or derived therefrom and all renewals and extensions of such copyright(s):

Title:          "Sex in the City" (see exhibit "A" attached for complete list)
Written by:      Candace Bushnell

Owner and Purchaser have entered into or are entering into a formal option/purchase agreement dated as of December 18, 1995 ("Agreement") relating to the transfer and assignment of the rights in and to said literary work, which rights are more fully described in the Agreement, and this assignment is expressly made subject to all of the terms, conditions and provisions contained in the Agreement, all of which are incorporated herein by reference.

IN WITNESS WHEREOF, the undersigned has executed this assignment this _1_ day of _MAY_, 1996.

_____
Candace Bushnell

STATE OF New York     )
                       ) SS.
COUNTY OF New York     )

On May 15 1996 before me, Bridgette V. Blyden, personally appeared Candace Bushnell, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.          (SEAL)

_____
Notary's Signature

BRIDGETTE V. BLYDEN
Notary Public, State of New York
No. 31-4967929
Qualified in New York County
Commission Expires June L. 1996

## AMENDMENT

The Amendment is between Home Box Office, a Division of Time Warner Entertainment Company, L.P. ("HBO") (as assignee of Darren Star, Inc.) and Candace Bushnell ("Owner"). Reference is hereby made to that certain option agreement (the "Agreement") dated as of December 18, 1995 between Darren Star, Inc. and Owner, c/o International Creative Management, 8942 Wilshire Boulevard, Beverly Hills, California 90211, Attn: Alicia Gordon, relating to the television series entitled "SEX AND THE CITY" (the "Program"). (Unless otherwise defined herein all defined terms have the same meanings set forth therefor in the Agreement.) For good and valuable consideration, receipt of which is hereby acknowledged, HBO and Owner hereby agree to supplement and amend the Agreement as follows:

Notwithstanding anything to the contrary contained in the Agreement, the following shall apply:

1.      With respect to the second and subsequent Series years, Owner shall receive the sum of Twenty-Five Hundred Dollars ($2,500) for each applicable one-half (1/2) hour episode produced for non-primetime or non-network television as set forth in section 5(c)(i) of the Agreement..

2.      Consultant Services: With respect to the second Series year, Owner shall be engaged as a consultant as follows:

(a)      Owner's consultant services (the "Services") shall be active, non-writing (at the Series office or at Owner's residence) and must be requested by HBO and be of a substantial nature (as distinguished from services provided for in section 4(c) of the agreement). In this regard, occasional phone calls and visits to the set shall not qualify as active Services;

(b)      Prior to commencing Services, Owner and HBO must be in agreement as to the nature and duration of such Services. Owner shall keep a time log in connection with the Services;

(c)      In the event Owner is not in breach hereof and renders all required Services, and in consideration of the Services to be performed hereunder, Producer shall pay to Owner (on a pay-or-play basis) the aggregate amount of Twenty-Five Thousand Dollars ($25,000) for second Series year Services, payable at the rate of One Thousand Dollars ($1,000) per work day (or payable at the end of the second Series year for any unpaid work days that were not required by Producer); and

(d)     Owner shall receive no credit on the Program in connection with the Services.

3.     Travel:  With respect to Series travel to Los Angeles which HBO requests, HBO shall provide Owner with:

(a)     One (1) business class (if available and if used) round trip air transportation (NY-LA-NY);

(b)     Ground transportation to and from the airport (or pre-approved reimbursement);

(c)     Hotel accommodations (room and tax only) while Owner performs Services hereunder in Los Angeles; and

(d)     Seventy-five Dollars ($75) per diem while Owner performs Services hereunder in Los Angeles (includes incidental costs and rental car costs).

Except as expressly provided herein, the Agreement is not otherwise modified in any respect, and the same as hereby supplemented and amended is hereby ratified and confirmed in all respects.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the day and year first above specified.

HOME BOX OFFICE, a Division of
Time Warner Entertainment
Company, L.P.

By
Its Vice President

CANDACE BUSHNELL

SEXCITY\BUSHNEL2.AMD:(12/10/98)

Darren Star, Inc.
c/o Bloom, Hergott, Cook, Diemer & Klein, LLP
150 S. Rodeo Drive, Third Floor
Beverly Hills, CA 90212
Attn: Melanie Cook, Esq.

Dated as of December 20, 1996

Candace Bushnell
International Creative Management
8942 Wilshire Boulevard
Beverly Hills, CA 90211
Attn: Danny Greenberg

Re: "Sex and the City" / Amendment

Ladies and Gentlemen:

Reference is hereby made to that certain fully-executed Agreement dated as of December 18, 1995 ("Agreement") between Darren Star, Inc. ("Purchaser"), on the one hand, and Candace Bushnell ("Owner"), on the other hand, with respect to (i) the series of magazine articles entitled "Sex and the City" written by Owner, and (ii) the presently unpublished book presently entitled "Sex and the City" written by Owner based upon the Articles (collectively, the "Property"). Notwithstanding anything to the contrary contained in the Agreement, and for the avoidance of doubt, it is hereby agreed as follows:

1.     Television Series Royalty Payments: If Purchaser exercises the Option and the initial production based upon the Property is a Pilot, it is agreed that in addition to the payments set forth in paragraph 4(c) of the Agreement, Owner shall be entitled to the applicable episodic royalty set forth in paragraph 5(c) of the Agreement for each Series episode produced based upon the Pilot. In the event there is no Pilot, the foregoing shall apply to each episode of the Series after the first episode.

2.     Television Series Character Use: If Purchaser exercises the Option and the initial production based upon the Property is a Pilot, it is agreed that Purchaser shall not have the right to utilize characters and /or material first appearing in the Articles published after December 18, 1995 in the Pilot; provided that it is agreed that Purchaser may utilize such characters and/or material in each Series episode produced after the Pilot, subject to the payment of royalties set forth in paragraph 5(d) of the Agreement. In the event there is no Pilot, the foregoing shall apply to each episode of the Series after the first episode.

Except as specifically set forth herein, all other terms and conditions of the Agreement shall remain in full force and effect. Capitalized terms used herein and not defined shall have the meanings ascribed in the Agreement. Please acknowledge your agreement with the foregoing by signing in the space provided below.

Very truly yours,

Darren Star, Inc.

By: _____

Its: _____

ACCEPTED AND AGREED:

_____
Candace Bushnell